Good morning. My name is Richard Angino, and I represent the Wiest, and we have an amicus for the whistleblowers, and we've agreed to give him five minutes, so I plan to talk for eight minutes. He will talk for five minutes, and we're asking for two minutes of rebuttal. And since we do have the individual from the whistleblowers who argued Sylvester, the preference would be that questions directed specifically to Sylvester might be best addressed to the amicus. But let me start with something a little lighter. We're hearing about big and also create pollution and they cause fraud. And we're aware that statutes and regulations are passed for the purpose of things such as that. So that when I appear before you today, a couple of the preliminaries have already been decided by Judge Jordan on a situation as far as plausibility, which we kept hearing about this morning. Santiago, Judge Jordan, you authored there, and also Long, you talked about the standard of review with regard to when you asked for rebuttal. So those two side issues I'm not going to address except to say that very recently Long was decided in February this year, Santiago was decided in March. So I would like to focus on what we have here basically is looking at time periods. We had an administration come in in 2001. We had Sarbanes-Oxley in 2002. We had an administration... Is this going to the Sylvester argument? I'm not sure where you're going with this. It seems to me you're jumping into the facts maybe prematurely or maybe unnecessarily. Are you arguing why the Sylvester standard controls and not Platoon? Where are you going? Well, let me go with the plausibility. They're intertwined. Obviously, Sylvester is intertwined with Platoon and with plausibility. So let me go specifically because the court would want to know what did we allege that fits within because it was dismissed because of... Maybe we can start with what you have to allege under the correct test and whether or not the district court's test was correct under Sarbanes-Oxley. Pardon me, sir? Maybe we can start with why you think the district court got it wrong in terms of what you have to allege first. That's going to be more important. Then we can go to what you allege. Why was the district court wrong? What the court did was to take Platoon and basically look for specific and particular. And when she looked at specific and particular, she was looking at emails. She was not looking at the allegations. And number 33 of the allegation is directly on point. And from 33 to 56 are directly on point. And if I could just call... Yes, Judge, you're ready to ask a question? I am. I want to ask you something that I think Judge Prater pressed you on when you were before her, or at least she wrote on it in her memorandum rejecting the motion for reconsideration. She said, you can't really, I'm paraphrasing liberally here, you can't really fault me for relying on Platoon because I can't grant you a motion for reconsideration unless there's an intervening change in controlling law. And the law you're citing to me is neither intervening nor controlling. Now, I understand you'll have your friends talk about whether that intervening point, I understood her to be saying Sylvester had come down. It came down before I decided this case. Nobody brought it to my attention. So it's in no meaningful sense an intervening change in the law. Is she clearly wrong about that? Well, I don't know that I've seen an interpretation from your court or from other courts in terms of what the word intervening means. How about between point A and point B? Pardon me? How about coming between point A or occurrence A and occurrence B? It did come, actually, between the time that the complaint would have been filed, between the time that the briefs would have been done, in May, this decision would have come down and we would have argued it within, I think her decision was in July. So there was that six-week period. But I think, Judge Jordan, your decision in Long says, whether we have review for a reconsideration in terms of the original decision or not, you're saying we an abuse of discretion standard in reviewing the denial of reconsideration, it would be an abuse of discretion in this case if the district court were wrong in saying that the heck required dismissal of the Long complaint. So it's not a question of intervening. Was Judge Prater wrong? That's the issue. I think you may have taken that Long language slightly out of context. It's certainly true that by definition it's an abuse of discretion to be incorrect on the law as it stands at the time the decision is made. But at the time the decision was made, if nobody, I guess everybody is arguing the same case to the judge, how is it an abuse of discretion for the judge to take the law that's presented and argued by everybody and render a decision on it? Because wrong means wrong, means wrongly decided, which in this case means even if we looked at it as a court needs to look at things, her decision based upon platoon put in words that aren't in the statute, so it violates the plain language of the statute. It violates the intent of the statute so that sticking in these words specific and particular by Judge Prater was wrong. Okay, let's accept that that is the case. That that was wrong and it is a reviewable error. Yes. Now speak to the second piece of Judge Prater's discussion in the memorandum for reconsideration denial. She said, look, even if I accept that Sylvester is somehow controlling here, it is not objectively reasonable. And I go with a reasonable belief standard. It's not objectively reasonable for Mr. Wiest to have believed that there was a securities fraud violation there. And in questioning with her in the trial court, you said, quote, every time you improperly allocate money to something that is improper, you are affecting the value of the company and the value of the company is determined by individuals who buy and sell the appendix. Is that still your theory of securities fraud, that any time somebody does something improper, it'll affect the value of the company and that means security fraud? No. My theory is that the law uses fraud. It doesn't have to be securities fraud. So I am, in effect, withdrawing that position on the basis that paragraph 33, Wiest established a pattern of rejecting and questioning expenses that did not meet standards set by accounting. That was one. The SEC and tax laws and regulations. So it's not limited to the SEC. We're talking about tax laws and regulations, which caused ethical concerns. Subjective. You use the word objective. The first step is subjective and objective reasonable belief of potential fraud. You've got to have both, right? Subjective and objective, right? Yes, but the subjective is your plausibility argument. The subjective is a plausibility. The objective comes after the facts come into play. You plead that your client thought that what was going on was similar to what happened with Kozlowski. Pardon me, sir? Did you plead that what your client thought he saw occurring was the same conduct Kozlowski had engaged in? Absolutely. Isn't that all you need under the test? That's all I would have needed. Wiest was particularly concerned and was amazed that his superiors authorized an island party with disturbing similarities to the past issues raised with Dennis Kozlowski, such as the Roman Party, for which Kozlowski is sitting in jail for fraud. I mean, basically, if he is saying you are doing the same thing that Kozlowski did, he was concerned subjectively and objectively that fraud was occurring. Was he concerned within the context of his, let me back up and ask it this way, was he doing what his job required him to do? Was he reviewing expenses and asking questions as his job required him to? Absolutely, because the buck stopped there. He has to authorize it before a check would get issued. He said if I were there, Kozlowski would not have happened. That was one of our allegations. So if he's doing what his job requires, asking questions associated with what his job requires, how can it be the case that asking a question, as is demanded of him by his job responsibilities, could reasonably be interpreted or understood as an act of whistleblowing? Asking is a word. Questioning is another word. In terms of plausibility, he was questioning. It wasn't just asking. He knew the answer. He knew the answer was that this was improper. Thank you. I'm waiting to see your answer, Mr. Angino. Let me make sure that your colleague gets some time. Mr. Cohn? Thank you, Your Honors. I am Steve Cohn. I'm here representing the Amicus Curie National Whistleblower Center. Maybe you can start with the last question that Judge Jordan asked. Yes. The case is concerning job duty speech. All concerned statutes which do not explicitly protect complaints to supervisors. Once you disassociate the whistleblowing with your right to go to your supervisor and raise a concern, all of this duty-related cases, and every one they cite to, start coming into play. Congress, in socks, put a discussion or a complaint raised with a supervisor on the same legal plane as going and testifying to the SEC. Sure. And consequently... Not questioning that. Yeah. Not questioning that. And you've cited our own case to us in, what is it, Forsyth Valley, with you on your assertion in that regard. The question isn't whether it can be whistleblowing under the right set of facts to go and speak to the supervisor. The question is, on the facts alleged here, is it fair to say that what was happening was whistleblowing or just the work of a person doing their job? Absolutely whistleblowing. Because? Because all whistleblowing starts with all, okay, 99 percent, 95 percent, starts with an employee seeing something that's an indication of fraud or misconduct. It is then reasonable in raising that concern with a supervisor to raise it as you would in the normal context of a job. Nothing in the law makes you cite to a statute or somehow elevate it. Nothing forces an employee who witnesses fraud... Is objective reasonableness part of the standard? Absolutely. But it's objective reasonableness from the point of view of the whistleblower, not the manager. Right. Not subjective. Objective reasonableness. Objective reasonableness means... It's the same reasonableness. Right. It's a standard that's apart from the individual and it implies that there is some standard to which the belief has to be held to be called reasonable, doesn't it? Absolutely. Okay, so isn't the standard to which it is to be held the legal standard for the specific unlawful behavior that's being blown the whistle on, so to speak? Like, how can you say we've got a case of securities fraud here or something even remotely like it unless, objectively speaking, the things that are available to be understood and communicated could be said to be securities fraud. Okay. Because you go back to the common sense standard that actually predates Passaic Valley, but Passaic Valley is predicated on. An employee sees something on paper that looks like taxation is not being properly recorded. There's some form of accounting error on a piece of paper. Exactly what Passaic Valley says, bring it to your supervisor. Now, if the supervisor says, great job, you found the error, let's move on. It would be patently unreasonable and objectively unreasonable for this person to go off on some campaign once it's been part of all these duty cases where supervisory complaints. That's the first step. So the supervisor says, no, keep your mouth shut. And did that happen here? Now you start the escalation. Did that happen here? Immaterial. Did they correct? When he said it, did they say, good catch? It's immaterial because the allegations in the complaint take you to that very first step, which in a whistleblower case is critical, exactly like this court held and its controlling precedent, we believe, to the Department of Labor. Because if you read Passaic Valley, they put reasonableness into a context. And here's the words of this court in Passaic Valley. Whether the employee was profoundly misguided or insufficiently informed is irrelevant. And the reason that's... consistent, if that's true, how can that be consistent with an objective reasonableness standard? Because... No matter how bizarre your mental state. Yeah. And that's the holding of this court. But I'll explain to you how. When you go back to the older cases that the Secretary of Labor relied upon and that went through, you're looking at an employee, an employee who may be afraid to raise a concern. And this is all well documented. You want to encourage the employee to raise a concern. I understand the policy. So when the employee subjectively thinks there might be an accounting irregularity, foresight, and objectively can justify that, how? In good faith, because this number says five and this number says eight. When you say objectively can justify that, are you saying... as soon as you say objectively can justify that, isn't the objective reasonableness the reasonableness of not... there's a discretion discrepancy, but there's a discrepancy here that amounts to a securities fraud or a mail fraud or a wire fraud. One of those predicates specifically named in SOX. I mean, it's not enough, is it, under SOX to say, I think there's something bad going on here. It's got to be one of the bads that's specifically named, doesn't it, in the statute? Your Honor, the statute says any violation of a rule or regulation of the SEC. There is no common lay employee outside of the office of general counsel, perhaps in a publicly traded company that knows what all those rules and regulations are. So is it the position... You're arguing that's the difference between Sylvester and Plouton. Pardon? You're arguing that's the difference between Sylvester and Plouton. But your position is... Well, answer my question first. Is that what you're arguing? Sylvester... Sylvester changes it from the question. Totally changes it because Sylvester adopts Passaic Valley, the controlling precedent that the concept of objective, this is where the confusion is. The real word and the word used in Passaic Valley is actually, is good faith. And good faith, when an employee raises a concern in good faith, has a subjective and an objective element. Subjective is, I really thought it was. Objective is, there has to be some type of factual basis within reason. So if this person is looking at a spreadsheet and the numbers all add up, but the employee says, this spreadsheet's on the wrong color paper. No one in good faith could say the color paper means anything. You look at the employee, and in this case, by claiming that taxes aren't being properly recorded. And I'll explain to you why that's so critical in the context of SOX. Well, why don't you explain to me this about SOX. SOX specifies things which are covered by the whistleblowing, right? Correct. I mean, if the Congress had wanted to say, you're protected anytime you want to say something bad is happening, I suppose they could have said that, right? But they didn't. They tied it to certain specific things which are determined to be criminal under the United States Code. Specific criminal things and violations of certain regulatory standards set by the SEC, right? Anything that violates the SEC's rules or regulations is criminal or not. It's not that things that exist in law, it's not a, well, maybe I should ask you, is it the National Whistleblower Center's position that SOX protects whistleblowers for anything that they think is morally reprehensible? Oh, absolutely not. Or anything they think smells bad. Absolutely not. It has to be something that's covered, right? And if you go back to Passaic Valley, that was a Clean Water Act case. So the concern of the employee had to be reasonably within a Clean Water Act dispute. No need to cite to the statute. No need to know if there really was a violation if it would be followed. And this Court, binding, because Congress affirmed the decision, Congress ratified the So when I'm saying objective, it's objective in the context where that employee may have been misguided in thinking there was a securities violation or insufficiently informed. And given the complexity of SEC regulations, Congress was wise to point to Passaic Valley. Then the Court goes on. This Court goes on and says the Court would err as a matter of law if it excluded ill-informed complaints. That is Passaic Valley. Congress looked at this and specifically cited to it and then inserted words in SOX, which were not in the Clean Water Act, to make it clear. Specifically, the right to go to a supervisor. And the right to go to the supervisor really changes the equation, because you have to protect the types of speech that employees would regularly take to a supervisor. Mr. Gunn, we do understand your argument. I'm not sure who's doing the rebuttal, but you do have some time for me. Thank you very much. Good morning, Your Honor. My name is Mike Finio, and I'm here for all of the appellees. Pull it a little bit closer to the mic. I'm sorry? Pull the mic a little bit closer. I'm sorry, Your Honor. I'm here for all the appellees. There's a couple of places where I could start, and I think it's important in a case where you've had a 12B6 dismissal to start with the right analytical framework. And my adversaries mentioned the Passaic Valley case. That is important here, and it's important because Passaic Valley involved this court in the review of an administratively final decision. Platoon and Sylvester are not controlling precedent in this court, and they weren't around in the Passaic Valley context. But in Passaic Valley, the Third Circuit looked at that. What did the Department of Labor do? Was it supported by substantial evidence? And to do that, they looked at the way that the Department applied its rules and regulations in interpreting the whistleblowing law under the Clean Water Act. Here, and the difference with SOX is, the SOX 806 whistleblowing statute is, when you come to federal district court, it's de novo, meaning that 180 days has expired in front of the Department of Labor. Nothing has happened. There's no administratively final decision. And you come to federal court, and you start over. You can't defer to an agency that didn't do anything. What the appellants are asking this court to do is to adopt a loose pleading standard from an administrative context and rewrite 12D6 case law, and the whole plausibility standard that we heard discussed in other cases. You're saying that by him pleading that he thought what he was saying was the same thing Kozlowski did and then elaborating upon that, that that somehow doesn't satisfy the Iqbal standard? No, it doesn't, Your Honor, because he didn't say that to his supervisors. Judge Prater spent, in her first opinion, pages analyzing every communication. The only communications that were handled by Mr. Wiest in this case were by email. And at worst, you could say he was doing his job, and he kicked it upstairs. He said, we need our tax and accounting people to look at this. Maybe this wasn't signed off correctly under our rules for signature authority for a certain amount of money. Those things were all taken care of. The things that he suggested needed to be looked at were looked at. But the fact that they're taken care of does not necessarily mean that there's still not a cause of action to disrobe any taxes. They could take care of it and then say, oh, we're going to nail this SOB. He should have kept his mouth shut. Next time our employees will know, they should keep their mouth shut. We've got to take care of this now because he's shown the right of day on it. But this is not going to happen again. When we throw a party, my gosh, we're going to throw a party and nobody out there is going to come in and tell us how we need to account for the money. But, Your Honor, the question that Judge Prater was looking at, she didn't get to the questions of retaliatory conduct. She looked at whether or not Mr. Wiest was engaged in protective activity. She didn't rely on Platone. She used it as a frame of reference throughout her opinion. And the Sylvester case, there's a debate if you read all the cases. Well, help me with what you just said. You said she didn't rely upon it, but she used it as a frame of reference throughout her opinion. To determine whether or not the emails that Mr. Wiest sent. She cited it specifically. I'm sorry? She cited it and relied on it specifically. Understood. I'm going to explain why I believe that she did. She did it because she was looking for an element in his communication that would give his supervisors an understanding that he was pointing to something bad happening. One of the things, Your Honor, that you mentioned. Is it Platone bad or is it Sylvester bad? I'm sorry, I don't understand. Is it defined bad or Sylvester bad? You said pointing to something bad happening. If you're looking through the Platone lens to see if something bad is happening, you get a different image, possibly, than if you look through the Sylvester lens. As Judge Prater said, it doesn't matter which one you look at. Under Platone, it's definitively and specifically, so presumably the standard is, did they cite the mail fraud statute in making this communication to their superiors? He didn't do that. Under Sylvester, it's was there some reasonable communication as to a violation that's covered by SOX? So why don't you go to the point that was being pressed on us by Mr. Cohn? He's pretty emphatic in saying Passaic Valley is what binds this court, and the court said it doesn't matter how off the wall the employee may be in thinking that there was a securities fraud. I think Passaic Valley is distinguished because this court, and I'll put it in the context of SOX, this court in Passaic Valley was reviewing an administratively final order. Here, under SOX, if you get to it- So what? What difference does it make? The statement made by the court in Passaic Valley was not, when we are reviewing an administratively final order, it was when we are wondering what's protected conduct, we ask ourselves, was this in good faith? And it doesn't matter how wildly off the mark the employee may have been. If you take that to its logical conclusion, you're going to throw the subjective reasonableness and objective reasonableness aspects of the analysis out the window, and you can't do that. You have a person who has an accounting function in a major corporation. All the business expenses pass over his desk. Somebody rents a car to allegedly take a business trip, and really what they did was take their child back to college in it. He says, I don't think that's legitimate because I don't have a receipt. Is it subjectively reasonable for him to think that there's some fraud on shareholders that's material, that he's engaged in a protected activity when he's going to do that? No, because it's not objectively reasonable to look at what he did under those circumstances and say he was causing Dennis Kozlowski-like alarm bells to go off. Let's go to the Atlantis event. You're talking about $350,000, and it was determined that there wasn't a business purpose for that, that they'd have to gross up bonuses for purposes of, or gross up their income to offset the tax consequence because they'd have to report that as a gift or as income. Correct. So why isn't that an evidence of shareholder fraud that he brought to their attention? He didn't say it was fraud. He said it wasn't. He questioned the business legitimacy. He didn't even know enough. What's the difference? I'm sorry? What is the difference? Because the question is whether it's subjectively reasonable in his head to think that there's a fraud occurring here. There was no allegation whatsoever that there was a fraud anywhere. Well, if it went forward without him questioning it, and if they had paid for that event, there would be at least a tax violation there, right? Well, the question then becomes whether it's material, which is an issue that wasn't looked at in this case. Your interpretation is really going to drastically rein in what Congress is trying to do when it enacted Sarbanes-Oxley. Your Honor, I don't agree with you on that. Because I know you don't. You couldn't. Well, I'd be a fool if I did. But the reason is that when Mr. Weiss made his complaints, and let's just say that he did focus on the one event where he questioned the business legitimacy. So what he caused Tyco Electronics to do was to look at an event that had been planned and submitted by people that worked there, the good faith of whom nobody questioned, and look at that and say, is there enough of a business purpose in this event to allow it not to be imputed income to our employees and to allow them to avoid the individual taxes? In other words, is this a legitimate business deduction for Tyco Electronics? The tax and accounting departments looked at that. They inquired of the people who were planning and putting the event together, and they said over this couple days that that event was occurring, we don't see enough of a business purpose. Therefore, our employees who attend are going to have income attributed to them, and we're going to gross up that income and pay the taxes for them. That business decision was made without anybody ever saying there was a fraud on anybody. So I'm not saying that Congress's intent under SOX is being set to the side. We have to look at this and say, subjective and objectively reasonable. Look at the circumstances of what this gentleman did. How should we understand the objective reasonableness component? We have an argument from Mr. Cohen about how to do it. He says, if I understood him correctly, the objective reasonableness piece of this is simply is there an objective basis as in a discrepancy between numbers or a discrepancy from company policy, if I've understood him right, that would allow or prompt somebody to raise a question. If I got him right, I'm sure he can correct me. I don't know if I followed his entire argument. That's what I understood it to be. The objective piece of this is it can't be that the person is hallucinating. There has to be some piece of evidence to prompt a question. But it's not the case that the objective piece has to be that the employee has an understanding of what securities law concepts like materiality and scienter and things like that are. Right. Because otherwise, you'd never have meaningful whistleblowing. So what's your response? How should we look at objective reasonableness? Step back and use the pleading standards that this court is familiar with, the 12B6 plausibility standards. Is it plausible to think that a person whose job was to look at the legitimacy of business expenses pointed out that he had a question, and he pushed it off to the people that had the more specialized knowledge of tax and accounting rules to look at it? Is it reasonable and plausible to think that when he did that, someone from the outside would say, he's looking at that and saying there is a fraud about to occur that's going to be having a material effect on shareholders in this company. I don't think a reasonable person looking at that objectively and understanding, and this is what Judge Prater said, looking at what Mr. Weiss did in the job that he had at Tyco, I don't think that that's objectively reasonable or plausible to think that he was pointing out a fraud. Now, is that the question that we're looking at here? I want to take this to the procedural posture that the case is in. Are we looking at whether she was wrong or whether there was a clear error of law given that this is an appeal from a denial of reconsideration? I think on that issue, it's whether she abused her discretion in denying reconsideration. The underlying standards for reconsideration with intervening and controlling change in the law manifest injustice or clear error. She went through that analysis. If she was wrong on the law, why would that rise to an abuse of discretion? I don't think she was wrong on the law. If you review it for a clear legal error, she applied the federal pleading standards to determine whether or not the story being told in this complaint was plausible in light of what she understood Sarbanes-Oxley's whistleblower provisions required. The last part of it is crucial because what she understood Sarbanes-Oxley to require was an understanding based upon her belief that Pluton, whether it was controlling or not, it certainly guided her inquiry. When she wasn't citing Pluton, she was citing cases that relied on Pluton. She cited Day v. Staples and some other circuit court decisions that said... Which relied on what? I'm sorry? Which relied on what? It relied on... Pluton. I'm sorry? Pluton. I think Day v. Staples did not... I'd have to check that, but I don't think it relied on Pluton. I'll take a look at it too. But Judge Prater's analysis was thorough in the sense that the second time around she said, I'm going to look at this for intervening and controlling precedent. She didn't see that. She said that the federal district court's precedents don't come from the administrative review board. Plus it wasn't intervening... Except, well, that would be more persuasive if she hadn't placed such weight on Pluton, which is an administrative review board case. In other words, she relied upon Pluton, and then, upon reconsideration, she said, well, our precedent doesn't... One, you didn't bring this case to my attention, and two, our cases don't rely upon decisions of the administrative review board, which is what she had relied upon when she made her initial ruling. The only reason that Judge Prater looked at Pluton was on the issue of whether or not there was a requirement for the punitive whistleblower to say, this is the one of the six items listed in SOX 806 that I'm pointing to that's happening with this conduct. Okay? She looked at that again under Sylvester and said, you know what? It doesn't matter. This wasn't a protected activity because he was doing his job, because the company reacted favorably. She was focused on protected... She said there had to be a report of an existing violation. That's true. Is that your position, that it has to be an existing violation? Existing or... And that the statute would not protect somebody who makes a report that forestalls or prevents a violation? I think if you open that door in the de novo context in the federal courts, people will wait 180 days and hope that the Department of Labor does nothing, and they will come here and have an easier time in this court, which is bad policy. Maybe they should fix the statute. I'm sorry? Maybe they should fix the statute. It seems to me that if we're to give Sorbane-Zoxley their medial impact that he was supposed to have had, it's difficult to read out of this protective scope people who do what their job requires because you can still get nailed to the wall for doing what your job requires if your supervisor thinks that you're not playing ball with the team and you're going to go running to the feds and blowing the whistle every time the company decides to get loosey-goosey with its accounting practice. That's what the case law currently requires with respect to people doing their job, and I think we need to begin, and I'll conclude with this as my time wraps up here unless there are more questions. We need to remember that this is different in this forum than the other whistleblower statutes because you can get into this court in a de novo position. So starting over in federal court, you've made your complaint to OSHA. You've started there. Here, and this was in the district court record, after the 180 days was up, OSHA said there was no violation here. OSHA said there was no causation between the events he reported and his ultimate termination. So he filed as he didn't appeal that, or I think actually he did appeal it prophylactically, but didn't pursue it, but filed an action here where the statute says it's a de novo case, you start over. So we already know that OSHA found no violation, and we're going to start here and give them a bigger benefit of the doubt because we're going to lean towards listening to the administrative pleading standards, which everybody knows are relaxed and aren't as rigorous as the 12B6 standards in federal court. That would turn pleading on its head and allow pretty much anybody. So did the administrative agency finally engage in protected activity then? No. You said they decided it on causation. I don't think that they found a protected activity. They focused on the causation issue. They said this is what happened. They assumed protected activity. They had to. I'd have to read it again, Your Honor, but they were 14 months apart. Okay. Mr. Fenio, thank you very much. Thank you, Your Honor. Mr. Cohen, you're doing rebuttal? You can start with one of the points Mr. Fenio made at the end about the extent to which, if at all, a person is protected if they blow the whistle within the scope of their duties. Okay. And just to explain that, that controversy existed in whistleblower law for about 25 years, courts going different directions. The Chamber of Commerce cited to a lot of cases that went one way. In SOX, Congress fixed it because they inserted the word report to a supervisor in the statute, which in their understanding was a ratification of all those cases that protected pure internal speech. In the words of the McCowiack Court, which the Department of Labor and Congress decided to, McCowiack said, doing your job as an auditor too well. That's protected activity. That's McCowiack. And that's the line of cases they looked at when they switched it. Hold on. Is there… What is to prevent an employee who just is doing their job and doing it well from turning every disciplinary action into a whistleblower? I mean, can it really be the case that if I do my job and I do it well, which involves asking questions, that when I'm called on the carpet for making a sexually suggestive remark to a co-worker or pilfering money from the coffee room or doing some other thing that disrupts the workforce and causes the company to say it's time to discipline you, that I'm untouchable now? You can't touch me because I asked you a question about our tax returns. And I will… That's a whistleblowing. So don't mess with me. Can that really be the case? No, no, absolutely not because that's the causation issue. And most of the whistleblower cases, the whistleblowers survive on protected activity issues and they lose on causation. You're talking causation. But the other thing is I think if you look at the Sylvester case… In other words, causation is why are you fired? I'm trying to ask you about protected activity. Or because of sexual harassment. I'm trying to ask you about protected activity because I understood that last comment you made to be if you do your job, quote, too well, you're in protective activity territory. If just doing your job is protected activity, then what isn't whistleblowing? It's all whistleblowing. No, because that's where you have to understand the difference between the pleading standards and causation. And it's kind of spelled out on Sylvester page 15, which I call the court's attention to. They say that the objective reasonableness standard often implies combinations of law and fact and that they usually need an adjudicatory hearing to pull that out. For if an employee comes in at the pleading stage, be it in federal court or the Department of Labor, and says, I was doing my job, I was raising all these concerns, and they're after me, that might get you to phase one. But after there's an adjudicatory hearing and the witnesses can testify about, hey, what are you really raising those concerns about? Is it really plausible? And that's in this case, it was a 12B6 case. They never had a hearing on that. So the mere fact you can survive at the pleading stage, according to Sylvester, does not mean you're going to survive at the hearing stage or the trial stage. And their discussion of how the objective standard permits a court to apply objective reasoning becomes... So your position is that the bar, the protected activity bar, is a very low bar. Correct. That it is a... To be objectively reasonable in your belief that you're engaged in whistleblowing, you can... You only have to be doing your job and tell your supervisor, I'm wondering about this expense. And you're good. If, in the context of that conversation, most likely you're going to be protected. The moment you say, I'm wondering about that expense, and I just want to state that there's a major policy for that, because when the Association of Certified Fraud Examiners looked at this, what they said, and it's cited in our brief, I don't know if this section, but the report is, they said that what you have to encourage is the reporting of any indication of fraud. Because frauds are usually discovered and you find a little thing out of place. Then maybe it gets put back in place, it was never an issue. But because frauds are designed to be hidden, the key to detection is encouraging employees to report those little things through their chains of command where most reporting happens. Then see how it flows out. But if you intimidate people or push them back at that very first step, that's where you're going to have a disaster. I want to state that. I think that in this particular case, Chevron and congressional ratification merge. Because if you read the report, and I really call your attention to Senate Report 107-46, three times in the report, the first time they say, the whole committee of judiciary, the same burdens as in the whistleblower laws. They want socks to be the same as in these other whistleblower laws as they had. Then you have the specific site to Passaic Valley, and then you have the Republican, in a concurring minority opinion, supporting some, not supporting others, specifically stating that they want this law to track those procedures already existing. So Congress looked at Passaic Valley, and they wanted it. If that's true, what are we to make of the ARB jettisoning platoon on the argument that, oh, that definitively and specifically language, that all comes from the ERA, from the Energy Recovery Act. That's just not socks at all. How does the stuff you've just cited and the fact that Passaic Valley itself goes to pains to say, these whistleblower statutes are all of a piece and specifically cites to the ERA, and now you're telling us the legislative history here, they all meant to be of a piece. How come that one bit of authority that evidently Congress knew about and was saying we want it to all be of a piece, is now, yeah, that's for the ash heap. Well, as they explained to Sylvester first, it was interpreting a provision of the ERA that does not exist in socks. So if socks wanted a provision of socks to be interpreted that way. It doesn't exist in the Clean Water Act either, does it? Or the Clean Air Act? I don't believe it does, but it was something unique to the ERA. And Passaic Valley cited specifically to the ERA cases and said that's persuasive here. So that's not very persuasive coming out of the Sylvester ARB. No, not to the ERA cases that were later decided. All of the ERA cases cited by the circuit, begun with this old mine health and safety case from 1969 that was also ratified, which talked about a miner and talked about common sense reporting that most people go to the supervisor and it has to be just predicated on common sense. From that decision, which overturned the Mine Health and Safety Commission, which said you've got to do more than just go to your supervisor, an entire body of law developed. Passaic Valley dealt with, there was a case, Brown and Ruth V. Donovan, that had rejected that line of cases and there was McCowie Act that had supported it. That was an auditor fired for doing his job too well. This came to the Third Circuit in Passaic Valley and they went 100% all in on the McCowie Act line, on the mine health and safety cases and on this very broad definition of at least an initial reporting right, be it to your supervisor or to the government. Gotcha. Okay. And thank you very much. Thanks. Thank you. I think the matter in the advisement is a very helpful argument from both sides.